RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0085p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JEFFERY EMARD,

        *Plaintiff-Appellant*,

   *v.*

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant-Appellee*.

No. 19-1591

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cv-01113—Philip J. Green, Magistrate Judge.

Decided and Filed: March 19, 2020

Before: GILMAN, McKEAGUE, and KETHLEDGE, Circuit Judges.

---

## COUNSEL

---

**ON BRIEF:** Ronald D. Glotta, GLOTTA & ASSOCIATES, P.C., Detroit, Michigan, for Appellant. Christopher L. Potter, SOCIAL SECURITY ADMINISTRATION, Boston, Massachusetts, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. Jeffrey Emard appeals the denial of his application for Social Security disability-insurance benefits. After a hearing, an Administrative Law Judge (ALJ) determined that Emard did not qualify as "disabled" under the Social Security Act, 42 U.S.C. § 423 *et seq.* The district court affirmed the ALJ's decision on appeal. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

# I.  BACKGROUND

## A.     Factual background

Emard was injured in a motorcycle accident in 2010.  Prior to his injury, Emard had worked as an industrial truck driver, bumper assembler, and packager, but he ceased working after the accident.  He has not been employed since.  Emard was 33 years old at the time of his claimed onset of disability.

His application for disability-insurance benefits listed a host of claimed ailments, including chronic low-back pain, chronic neck pain, cervical radiculopathy, lumbar radiculopathy, chronic migraine headaches, fatigue, mood swings, anxiety, and Crohn's disease.  These ailments are documented in numerous medical records between 2012 and 2017, which are summarized below.

### 1.  *Javery Pain Institute*

The first series of records comes from the Javery Pain Institute, where Emard received treatment for low-back and neck pain from August 2012 to July 2013.  Emard was initially seen for a pain-management consultation by Aaron Greene, a Physician Assistant.  Greene's notes describe a magnetic-resonance-imaging (MRI) exam showing two small herniations of Emard's spine.  But Emard's spinal range of motion was described as normal at the time of his first visit.

Emard, who returned to the Javery Pain Institute nine times over the following year, was seen for a range of follow-up treatments.  He received a cervical medial-branch block and a lumbar steroid injection, both of which he described as "very effective" in treating his pain.  Emard was also treated with cervical radiofrequency ablation, an intervention that he described as a somewhat-effective pain treatment.  In another visit, Dr. Christopher Russo, a physician at the Institute, met with Emard for pain-medication review.  Dr. Russo also routinely saw Emard to review his treatment plan and perform physical exams.

Emard initially told Dr. Russo that his back pain was the same since his first visit to the Institute.  Toward the end of his appointments with Dr. Russo, however, Emard reported that his pain was becoming more controlled.  Dr. Russo's physical exams of Emard also consistently

showed a normal spinal range of motion. Indeed, with the exception of several positive pain-assessment tests and reports by Emard of tenderness in the spinal area, Dr. Russo's physical exams were normal. Emard's mood was likewise described as normal during each visit.

### 2. *Ionia Family Practice*

A second series of medical records, dated from 2013 to 2015, documents Emard's appointments at Ionia Family Practice. Emard was first seen at Ionia Family Practice for back pain and a range of gastrointestinal issues. In one visit, for instance, Emard reported that he had experienced three-to-five episodes of diarrhea daily for the past five years, although the results of his gastrointestinal test proved normal at the time. He was referred in 2015 to a gastroenterologist, Dr. Allan Coates, who reported that "evidence of erosions throughout the terminal ileum and biopsies were felt to be possibly consistent with Crohn's disease." Dr. Coates's records reflect diagnoses of gastroesophageal reflux disease (GERD) and possible Crohn's disease.

In June 2014, a Physician Assistant at the Ionia Family Practice diagnosed Emard with lumbago. Notes from the clinic further show that Emard underwent a second MRI exam in 2014. The exam revealed that Emard's spinal injuries had remained relatively stable. Emard, however, reported that his pain had worsened and that his symptoms were severe. He continued to be seen for back pain, which he rated as "moderate to severe," in several subsequent visits in 2014, but his physical-exam results remained normal. Emard was prescribed pain medication and muscle relaxers as treatment. His records show that he denied experiencing anxiety or depression during these visits, and his psychiatric evaluations remained normal.

### 3. *Sparrow Medical Group*

A third series of medical records documents Emard's visits to the Sparrow Medical Group, where Emard was seen by Dr. Lynette Masters and Physician Assistant Adam Montero from 2014 to 2017. Emard first visited the clinic complaining of back pain, which he described as "mild," "chronic," and "worsening" in subsequent appointments. In March 2015, Montero noted that Emard exhibited a decreased range of motion as a result of his back injury, although Emard's gait was described as normal at the time. Montero treated Emard with osteopathic

manipulation therapy.  Emard also began taking an antidepressant prescribed by Dr. Masters in March 2015, but his first expression of anxiety with both Dr. Masters and Montero did not begin until 2016.

### 4.  *Opinion evidence*

The administrative record includes opinions from several medical providers.  Dr. Colleen Landino, one of Emard's treating physicians, rendered an opinion in November 2012.  She explained that Emard had regularly been seen in her office for cervical-spine and low-back pain, that Emard "has been unable to work or function in a normal day to day life since [Dr. Landino's office has] been treating him," and that surgical intervention would only complicate Emard's injuries.  Dr. Landino further opined that Emard was "going to be unable to ever hold a job again."

Several consultative experts also offered opinions. Dr. Larry Jackson, a state-agency medical consultant, determined in May 2015 that Emard was capable of performing a range of light work subject to some postural limitations.  Neil Reilly, a Limited License Psychologist with Michigan's Disability Determination Service, opined in July 2015 that Emard's disability was mostly physical, but he described Emard's prognosis as "poor given the chronic nature of his pain" and noted that Emard's "issues with depression while not debilitating add to his general sense of feeling poorly."  Finally, Dr. Edward Czarnecki, a state-agency psychological consultant, opined in July 2015 that Emard had some occupational limitations, but Dr. Czarnecki nevertheless determined that Emard "retain[ed] the mental capacity for simple, rote, repetitive 1-4 step tasks with brief, superficial and occasional social interaction."

The record further contains an opinion from treating physician Lynette Masters dated in May 2017.  The opinion notes that Emard had been seen at the Sparrow Medical Group 22 times since he initiated care, and it lists Emard's pertinent diagnoses as inflammatory bowel disease, depression, anxiety, and chronic low-back pain.  Dr. Masters described Emard's prognosis as "fair," explaining that "the longer chronic medical conditions with pain and mental illness are present without achieving remission, the less likely it is that it will be achieved."

**B.      Procedural background**

***1.  The ALJ's decision***

Emard filed for Title II benefits in 2015, claiming a disability-onset date of October 1, 2012 and a date last insured of September 30, 2015.  After his application for Title II benefits was initially denied, Emard requested that his claim be heard by an ALJ.  The ALJ analyzed Emard's claim under the five-step process delineated in 20 C.F.R. § 404.1520(a)(4).

As summarized in *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997), 20 C.F.R. § 404.1520(a)(4) provides as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Id.* at 529.

Moving through these steps, the ALJ first determined that Emard had not engaged in substantial gainful activity during his insured period.  She concluded at the second step that Emard's degenerative disc disease of the cervical and lumbar spines, asthma, obstructive sleep apnea, anxiety, and depression were severe impairments, but that his other conditions were only mild impairments.  The ALJ determined at the third step that none of Emard's impairments or any combination thereof met the criteria of any listed impairment.

Before proceeding to the fourth step, the ALJ concluded that Emard had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), with some

limitations. The ALJ's conclusion was supported by her finding that Emard's "subjective complaints exceed the available objective records," particularly in light of Emard's conservative course of treatment.

Discussing Emard's residual functional capacity, the ALJ discounted Dr. Landino's opinion because the latter's statement that Emard "would be unable to ever hold a job again" was an "administrative finding[] . . . reserved to the Commissioner." The ALJ also determined that Dr. Landino's opinion was "inconsistent with the claimant's generally conservative course of treatment." She similarly declined to assign much weight to psychologist Reilly's opinion that Emard's prognosis was "poor" because the opinion was "vague" and inconsistent with the medical record.

As evidence of an even-handed evaluation, the ALJ also gave "little weight" to Dr. Jackson's 2015 opinion that Emard could perform "light work subject to some postural limitations" because the ALJ found that Emard was "more limited than determined by the medical consultant." In contrast, the ALJ gave Dr. Czarnecki's opinion that Emard could perform "simple, routine, repetitive 1 to 4 step tasks with brief, superficial and occasional social interaction . . . partial weight." This left Dr. Masters's 2017 opinion. In the end, the ALJ determined that the opinion should not be given any weight because it "provide[d] limitations for the claimant subsequent to September 30, 2015, the date last insured[,]" and was "not dispositive of [Emard's] ability to function on or before that date."

The ALJ determined at the fourth step that Emard could not perform past relevant work. At the fifth and final step, the ALJ found that Emard could perform jobs that existed in significant numbers in the national economy. These jobs included "bench assembler positions," "inserter positions," and "parts checker positions." The ALJ thus concluded that Emard was not disabled during the insured period.

### 2. *District-court proceedings*

Emard filed an appeal of the ALJ's decision to the district court, which affirmed the denial of disability-insurance benefits. On appeal to this court, Emard argues that the ALJ erred by (1) declining to give any consideration to Dr. Masters's opinion; (2) examining Emard's

ailments individually, rather than in combination; (3) determining that some of Emard's impairments were nonsevere; and (4) failing to properly consider Emard's ability to work on a sustained basis.

## II.  ANALYSIS

### A.      Standard of review

We exercise de novo review of district-court decisions in Social Security cases.  *Valley v. Comm'r of Soc. Sec.,* 427 F.3d 388, 390 (6th Cir. 2005).  Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record, we must affirm the Commissioner's conclusions.  42 U.S.C. § 405(g).  Thus, we "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).  "Where substantial evidence supports the Secretary's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion." *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990).

### B.      The ALJ properly discounted Dr. Masters's 2017 opinion.

Emard first argues that the ALJ violated the Social Security Administration's regulations by declining to give any consideration to the opinion of Dr. Masters.  Under Social Security Regulation (SSR) 96-2p, "[i]f a treating source's opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted."  A "treating source" is defined as "your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1527(a)(2).  Emard contends that, in light of his ongoing relationship with Dr. Masters, the physician's 2017 opinion should have been considered in the ALJ's analysis.

He impliedly concedes, however, that a treating source's opinion is of more limited relevance when provided after a claimant's date last insured, as was Dr. Masters's opinion here.

Emard does so by citing a district-court case, *McAfee v. Commissioner of Social Security*, No. 1:16-CV-1417, 2018 WL 1516846 (W.D. Mich. Mar. 28, 2018), in support of his argument. The court in *McAfee* explained that "[e]vidence of a claimant's medical condition after the last insured date is only considered to the extent it illuminates that condition before the expiration of the claimant's insured status." *Id.* at \*4 (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)).

This principle has been repeatedly embraced by prior decisions of this court. In *Casey v. Secretary of Health & Human Services*, 987 F.2d 1230 (6th Cir. 1993), for instance, this court discounted evidence from a treating source offered after the date last insured where the evidence "discuss[ed] [the claimant's] medical history in general" but contained "no reference" to the claimant's condition during the insured period. *Id*. at 1233. This court in *Johnson v. Commissioner of Social Security*, 535 F. App'x 498 (6th Cir. 2013), likewise determined that the ALJ did not err in declining to give a treating source's opinion any deference when the opinion was provided after the date last insured. *Id*. at 506. And in *Higgs*, this court discounted evidence obtained after the claimant's date last insured where the evidence was "minimally probative" of the claimant's health during the insured period. 880 F.2d at 863.

Under this court's precedents, the ALJ was thus required to consider Dr. Masters's opinion only to the extent that the opinion reflected Emard's limitations before his date last insured. But Dr. Masters's opinion does not appear to relate back to Emard's condition prior to September 2015. Dr. Masters's opinion, for example, addresses Emard's anxiety at length, yet the record shows that Emard did not complain of anxiety to Dr. Masters until 2016, which was well after Emard's date last insured.

And although Dr. Masters reported that she had seen Emard at her office beginning in early 2015, which was during the insured period, the physician's opinion was phrased in the present tense and described Emard's specific limitations "at the current time." That language is similar to the relevant language in *Grisier v. Commissioner of Social Security*, 721 F. App'x 473 (6th Cir. 2018), where this court upheld an ALJ's decision to discount a medical opinion from after the date last insured where the opinion stated that the claimant "would have very, very significant limitations *right now*." *Id*. at 477 (emphasis in original). Had Dr. Masters's opinion

described Emard's specific limitations during the insured period, the ALJ would have been required to give the opinion more weight. But analogous to the circumstances in *Grisier*, substantial evidence supports the ALJ's determination that Dr. Masters's opinion related solely to Emard's condition in 2017.

We have precedent, moreover, pointing to an affirmance of the ALJ's adverse decision if supported by substantial evidence even if Dr. Masters's opinion were deemed to relate back to Emard's medical condition before the date last insured. *See Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004) (explaining that "substantial evidence for the ALJ's conclusion that Claimant was capable of a limited range of medium level work" supported the ALJ's decision where the treating source opinion was obtained after the date last insured); *Shavers v. Sec'y of Health & Human Servs.*, 839 F.2d 232, 234 (6th Cir. 1987) (per curiam) (declining to reach the issue of whether the ALJ erred in failing to consider evidence offered from a treating source after the date last insured where the ALJ's decision was supported by substantial evidence).

Substantial evidence indeed supports the ALJ's conclusion in the present case. Emard's medical records show that he responded positively to medical intervention, that his physical exams were mostly normal, and that Emard pursued a conservative line of treatment. And Dr. Czarnecki's opinion that Emard was not disabled further supports the ALJ's conclusion.

Emard's reliance on *Blakley v. Commissioner of Social Security*, 581 F.3d 399 (6th Cir. 2009), is inapposite. The court in *Blakley* determined that the ALJ had not complied with the requirement in 20 C.F.R. § 404.1527(d)(2) to give treating-source opinions controlling weight. *Id*. at 406. But, as is obvious from the context of the case, the medical opinions in *Blakley* were rendered during the claimant's insured period and related to his condition at that time. *Id*. at 401, 407–09. Because the ALJ in *Blakley* had plainly failed to comply with the regulations, the presence of substantial evidence in the record did not excuse the ALJ's procedural error. *Id*. at 409–10. In contrast, this court has made clear that an ALJ makes no such procedural error by declining to give any weight to the opinion of a treating source offered *after* the claimant's date last insured when the opinion does not relate back to the insured period. *See, e.g.*, *Johnson*, 535 F. App'x at 506.

**C.      The ALJ complied with the requirement to view Emard's impairments in combination.**

Emard next argues that the ALJ improperly considered each of Emard's impairments individually, rather than in combination, in determining Emard's residual functional capacity. He likewise contends that the ALJ improperly excluded Emard's nonsevere impairments from her consideration.

Twenty C.F.R. § 416.945(e) provides that the ALJ will consider the "limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity." SSR 96-8p explains that, "[i]n assessing [residual functional capacity], the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" According to Emard's brief, the ALJ erred in failing to recognize that, although Emard's "chronic diarrhea . . . , by itself, does not necessarily interfere with 'basic work activities,'" his "chronic diarrhea with back pain and abdominal pain interferes substantially with work related functions." (Emphasis in original.)

Although the ALJ did not specifically discuss the combined effect of Emard's impairments or mention Emard's nonsevere impairments in assessing his residual functional capacity, she stated that she had carefully considered the entire record and "all symptoms" at this step in the process. This court in *Gooch v. Secretary of Health & Human Services*, 833 F.2d 589 (6th Cir. 1987), concluded that an ALJ's statement that he had conducted "a thorough review of the medical evidence of record," along with the fact that the ALJ had considered the claimant's impairments individually, sufficed to show that the ALJ had considered the impairments in combination. *Id.* at 591–92. It explained that "the fact that each element of the record was discussed individually hardly suggests that the totality of the record was not considered," and "[t]o require a more elaborate articulation of the ALJ's thought processes would not be reasonable." *Id.* at 592. As in *Gooch*, the ALJ's statements that she had considered the entire record and all of Emard's symptoms suggest that she had considered Emard's impairments in combination.

Moreover, the ALJ specifically noted in her summary of the applicable law that she was required to comply with SSR 96-8p's mandate to "consider all of the claimant's impairments,

including impairments that are not severe." District courts in this circuit have held that an ALJ need not specifically discuss all nonsevere impairments in the residual-functional-capacity assessment when the ALJ makes clear that her decision is controlled by SSR 96-8p. *See, e.g.*, *Morrison v. Comm'r of Soc. Sec.*, No. 1:14-CV-1059, 2016 WL 386152, at \*4 (W.D. Mich. Feb. 2, 2016), *aff'd*, No. 16-1360, 2017 WL 4278378 (6th Cir. Jan. 30, 2017); *Davis v. Comm'r of Soc. Sec.*, No. 1:14-CV-0413, 2015 WL 5542986, at \*4 (W.D. Mich. Sept. 18, 2015). These decisions have relied on this court's decision in *White v. Commissioner of Social Security*, 572 F.3d 272 (6th Cir. 2009), where an ALJ's statement that she considered a Social Security Ruling pertaining to credibility findings sufficed to show that the ALJ complied with that ruling. *Id.* at 287. The ALJ's express reference to SSR 96-8p, along with her discussion of the functional limitations imposed by Emard's nonsevere impairments at step two of her analysis, fully support our conclusion that the ALJ complied with 20 C.F.R. § 416.945(e) and SSR 96-8p.

**D.      Whether Emard's GERD, insomnia, and hypersomnia impairments are severe or mild is legally irrelevant.**

Emard's third argument is that the ALJ erred in determining that Emard's GERD, insomnia, and hypersomnia impairments are nonsevere. But "[t]he fact that some of [a claimant's] impairments were not deemed to be severe at step two is . . . legally irrelevant" where other impairments are found to be severe. *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). An erroneous finding of nonseverity at step two is therefore harmless where the ALJ properly considers nonsevere impairments at later steps. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (concluding that an ALJ's finding that a condition was nonsevere "could not constitute reversible error" where the ALJ "properly could consider . . . [the] condition" at the remaining steps); *see also Gray v. Comm'r of Soc. Sec. Admin.*, 365 F. App'x 60, 61 (9th Cir. 2010) (holding that a finding of nonseverity at step two was legally irrelevant where the ALJ complied with SSR 96-8p's requirements, even where the ALJ did not specifically reference nonsevere impairments in the residual-functional-capacity analysis). Because Emard's degenerative disc disease of the cervical and lumbar spines, asthma, obstructive sleep apnea, anxiety, and depression were considered severe impairments, and because we have determined that the ALJ properly considered Emard's nonsevere impairments

at later steps, Emard's arguments regarding the severity of his GERD, insomnia, and hypersomnia impairments are unavailing.

**E.　　The ALJ complied with the requirement to consider Emard's ability to work on a sustained basis.**

Emard's fourth and final challenge rests on two Social Security Administration rulings: SSR 85-15 and SSR 96-8p. He has forfeited his argument based on SSR 85-15, which clarifies the framework for evaluating nonexertional impairments, because he raises it for the first time on appeal. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) (explaining that the court may refuse to consider issues not contested below).

This leaves SSR 96-8p, which provides that "[o]rdinarily, [residual functional capacity] is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Emard argues that, by referring to Emard's capacity "to maintain his activities of daily living independently, cook, perform household chores, drive, shop and handle his finances" in her discussion of Emard's mental-health impairments, the ALJ violated SSR 96-8p.

His contention ignores the fact that the ALJ's residual-functional-capacity determination was based on more than her conclusion that Emard had the capacity to maintain his activities of daily living. Substantial evidence in the record supports the conclusion that Emard could also perform sustained work under SSR 96-8p. Dr. Czarnecki's opinion that Emard was not disabled, for instance, provided substantial evidence to support the ALJ's residual-functional-capacity determination. *See Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) (relying on evidence from a reviewing state-agency physician to conclude that the ALJ satisfied SSR 96-8p). Moreover, the ALJ detailed Emard's exertional and nonexertional abilities in assessing Emard's residual functional capacity. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 729 (6th Cir. 2013) (finding that the ALJ had complied with SSR 96-8p when the ALJ fully specified the claimant's exertional and nonexertional abilities).

**III.　CONCLUSION**

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.